## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

MATTIE R.,[1]

                              Plaintiff,

v.                                                    ACTION NO. 2:20cv322

ANDREW M. SAUL,
Commissioner of Social Security,

                              Defendant.


### UNITED STATES MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

Mattie R. ("plaintiff") brought this action, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act. ECF No. 1.

An order of reference assigned this matter to the undersigned. ECF No. 11. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is recommended that plaintiff's motion for summary judgment, ECF No. 13, be **DENIED,** and the Commissioner's motion for summary judgment, ECF No. 15, be **GRANTED.**

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons. COMM. ON CT. ADMIN. & CASE MGMT. JUD. CONF. U.S., PRIVACY CONCERN REGARDING SOCIAL SECURITY AND IMMIGRATION OPINIONS 3 (2018).

## I.   **PROCEDURAL BACKGROUND**

Plaintiff applied for disability insurance benefits on March 7, 2018, alleging disability beginning August 1, 2017, due to knee pain from a torn meniscus and surgeries, low back pain, headaches, and gastrointestinal distress.[2] R. 168–74, 194. Plaintiff's date last insured for purposes of disability insurance benefits is December 31, 2022. R. 15, 183.

After denial of her claim for benefits both initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). R. 59–83, 117–19. ALJ Carol Matula held a hearing on plaintiff's claim on September 20, 2019,[3] and issued a decision denying plaintiff benefits on October 7, 2019. R. 12–28, 30–53. On the day of the hearing, plaintiff amended her alleged onset date to August 1, 2018. R. 33–34, 189.

The Appeals Council denied plaintiff's claim for benefits on May 21, 2020. R. 1–6. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981.

Having exhausted administrative remedies, plaintiff filed a complaint on June 23, 2020. ECF No. 1. The Commissioner answered on January 6, 2021. ECF No. 9. The parties filed motions for summary judgment, with supporting memoranda, on February 8 and March 10, 2021, respectively. ECF Nos. 13–16. In the absence of special circumstances requiring oral argument, the case is deemed submitted for a decision.

---

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

[3] At this hearing, and before the Court, plaintiff has been represented by Robert Gillikin, Esquire. R. 30.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    Background Information and Hearing Testimony by Plaintiff

Plaintiff testified before the ALJ on September 20, 2019. R. 34–49. At that time, she was 53 years old and living with her husband and 32-year old daughter. R. 36, 168–69. Plaintiff completed the tenth grade. R. 36. Plaintiff last worked in August 2017. R. 195. Her work history includes managing apartments, doing apartment maintenance, and working as a janitor. R. 36–39.

Plaintiff testified that she began having left knee problems four years earlier and experienced deterioration in the last few years due to wear and tear. R. 39. Plaintiff reported having two knee surgeries, one in 2017 and one in 2018. R. 39–40, 47–48. Following her second surgery, plaintiff stated that her knee buckles and causes her pain that she rates at a seven out of ten, and she can only walk one block before it starts to give out. R. 40–41, 43, 47. She reported attending physical therapy for her knee, and wearing a left knee brace off and on for over one year when walking and standing. R. 48–49.

Plaintiff testified that knee pain was affecting her feet, which she addressed with inserts in her shoes. R. 41–42. She received steroid injections in her left knee and foot for pain. R. 48. Plaintiff further reported back pain due to arthritis and a pinched nerve for which she does home exercises and attends physical therapy. R. 42–43. Plaintiff also experiences sharp pain in her right leg. R. 48.

Plaintiff reported sitting or lying down for much of the day, reading books and watching television. R. 43. She tries to do some cleaning, and prepares small meals, but her husband and daughter do most of the cleaning, cooking, and yardwork. R. 44–45. She shops for groceries and goes to Walmart, but usually takes her daughter with her. R. 45–47.

Plaintiff's function report to the SSA, dated May 1, 2018 (three months prior to her amended alleged onset of disability date), contains similar information. R. 221–29. Plaintiff reported that she prepared meals twice weekly for about two hours, vacuumed one time a week with assistance from others to move things, and cared for her foster nephew. R. 223–24. Plaintiff advised that migraines, back pain, and knee pain left her unable to do house and yard work. R. 224–25. Plaintiff indicated that her conditions affected her ability to walk or sit for long periods of time, sleep, dress, bathe, care for her hair, and, sometimes, use the toilet. R. 223.

Plaintiff confirmed she could drive and go out on her own, and did so to shop one time a week for one and a half hours. R. 225. Plaintiff reported spending time with others four times each week at her home, where they would help her out. R. 226. She also attended church, though needed someone to accompany her. *Id.*

Plaintiff reported that her ability to lift, walk, climb stairs, squat, sit, bend, kneel, use her hands, stand, and reach were affected by her conditions. R. 227. Plaintiff advised she could walk for five minutes before needing to stop and rest. *Id.* She reported that she was prescribed a cane five months prior that she uses when walking, and that she also had a knee brace. R. 228.

## B.   Hearing Testimony by Vocational Expert

Robert Edwards, a vocational expert ("VE"), also testified at the hearing. R. 49–52. The ALJ presented VE Edwards with two hypothetical questions premised on a person of plaintiff's age, education, and past work experience, who was limited to light work, and who could frequently climb ramps and stairs and occasionally stoop, kneel, crouch, crawl, and climb ladders, ropes and scaffolds. R. 50–51. The ALJ first inquired whether such a person would be able to perform plaintiff's past relevant work, and VE Edwards testified that such a person would be precluded from plaintiff's past relevant work as a building maintenance worker and a janitor, which required

4

a medium exertional level. *Id.* The ALJ next inquired whether there would be jobs in the national economy for such an individual, and VE Edwards testified that such a person could work as an information clerk, clerical clerk, and office helper and that tens of thousands of such jobs were available nationally. R. 51. VE Edwards testified based on his knowledge and experience as a vocational rehabilitation counselor that such an individual would need to maintain an 85% productivity level and be absent less than two days per month. R. 51–52.

## C.     Relevant Medical Record

Consistent with the issue argued in plaintiff's brief—plaintiff's ability to stand and walk—the Court's review of the medical record focuses primarily upon plaintiff's knee, hip, back and foot issues.

### 1.     Prior to August 1, 2018—Plaintiff's Alleged Onset of Disability

#### a.     *Virginia Institute for Sports Medicine—arthroscopic surgery on right knee*

On March 17, 2017, Paul Versage, PA-C, with Virginia Institute for Sports Medicine, gave plaintiff a cortisone injection in her right knee to treat pain that began suddenly two months prior without any known injury. R. 304, 306–07.

On March 24, 2017, plaintiff reported to physician's assistant Versage that the injection provided her with 40% relief, lasting for three days. R. 308. She also reported a "giving way episode" that caused her to fall to the ground striking the side of her knee, with no serious injury. *Id.* An MRI performed February 9, 2017, showed a meniscus tear. R. 309.

On August 14, 2017, Dr. Lambert performed a right knee arthroscopic debridement of plaintiff's lateral meniscus. R. 300–01, 318. Plaintiff's reported surgical history included "Arthroscopy Right Knee, Arthroscopy Left Knee, R[ight] knee scope 2015." R. 294.

5

On August 23, 2017, plaintiff returned to have her sutures removed. R. 318.  She reported calf pain for the previous two days that she was treating with Norco.  *Id.*  She was ambulating without assistance, and her knee motion was "excellent" with minimal postoperative effusion.  *Id.* Photographs from the surgery revealed "a sizable lateral meniscus tear," and minimal degenerative changes.  *Id.*  Plaintiff was referred to physical therapy for two to three weeks.  *Id.*

On September 20, 2017, plaintiff reported "an aching/burning pain" in her right knee that increased with weight bearing, and pain when pivoting, twisting, and ascending and descending stairs.  R. 320.  She reported improved range of motion, stiffness, difficulty kneeling, and paresthesia in her lower leg.  *Id.*  Plaintiff ambulated with a cane, and was encouraged to continue physical therapy.  R. 320–21.

On November 20, 2017, plaintiff reported discontinuing physical therapy, ambulating without an assistive device, and using Ibuprofen as needed for pain.  R. 322.  Plaintiff "request[ed] a release letter so she can apply for disability and unemployment."  *Id.*  Examination of both knees revealed straight leg raising with no lag,[4] negative Lachman's, and no instability.  R. 322–23.  The left knee exam revealed "3/0/120° range of motion" with no effusion, no tenderness, and good quad strength.  R. 322.  The right knee exam revealed "3/0/125° range of motion" with mild effusion, tenderness in the medial joint line, and good quad tone.  *Id.*  Dr. Lambert indicated that he "reviewed the previous x-rays and operative pictures" and plaintiff had "reached max[imum] medical improvement."  R. 323.

### b.      *Greenbrier Therapy Center*

Plaintiff began physical therapy with Greenbrier Therapy Center on August 31, 2017, two weeks after her right knee arthroscopic surgery.  R. 360–63.  She demonstrated impaired gait,

---

[4] Muscle lag is an inability to actively move a joint to its passive limit.

decreased range of motion, and decreased strength. R. 361. Plaintiff reported using crutches for a few days following her surgery, but currently ambulating without an assistive device. *Id.* Plaintiff reported pain, swelling, and stiffness. *Id.* Her therapist recommended physical therapy two times per week for two to three weeks. *Id.*

Plaintiff returned for therapy sessions on September 18, 2017, January 26, 2018, and February 2, 2018. R. 351–60. On September 18, 2017, she tolerated activity poorly. R. 356. She reported doing more at home resulting in increased pain (rated eight out of ten), and an inability to kneel at work. R. 357. Her hip strength was reduced to 3 or 4 out of 5, and her knee strength was reduced to 4 out of 5. R. 359. Plaintiff was instructed to use a cane more at home when symptomatic, to increase use of ice, and to postpone activities if painful. R. 358.

On January 26, 2018, plaintiff returned to therapy, reporting low back pain for one month without sciatica. R. 353. The therapist noted plaintiff was unable to complete her prior therapy due to losing her job and insurance. *Id.* Notations indicate ongoing lower extremity weakness and gait abnormalities were likely leading to lower back pain with tenderness to palpation. *Id.*

On February 2, 2018, plaintiff reported continued back pain. R. 352. She showed a good tolerance to activity, however she did not schedule any further physical therapy appointments. R. 351.

### c. *Chesapeake Regional Healthcare—emergency department*

On September 26, 2017, plaintiff was treated at the emergency department for non-radiating, lower back pain for the previous week, that felt similar to previous muscle strains. R. 511. Plaintiff's stance and gait appeared normal, and she had good strength in all extremities. R. 514. She was discharged home with prescriptions for Robaxin and Norco. *Id.*[5]

---

[5] Lumbar spine x-rays taken on October 5, 2017, revealed no acute findings, no significant

On December 21, 2017, plaintiff was seen at the emergency department for elbow pain and low back pain without spasms, numbness, tingling, or weakness in her legs. R. 521. She had a normal range of motion, intact motor strength and sensation in all extremities, and lumbar tenderness. R. 523. Plaintiff was diagnosed with elbow tendonitis and lumbar strain and discharged with a muscle relaxer and Aleve. R. 524.

On July 2, 2018, plaintiff was seen at the emergency department for lower back and chest pain. R. 588. Plaintiff was able to move all extremities without difficulty, but was tender to palpation in the lumbar region. R. 590. Plaintiff was diagnosed with chest pain ("unspecified type") and bilateral low back pain without sciatica ("unspecified chronicity"), and was discharged with a muscle relaxer. R. 592–93.

#### d. *Volvo Medical Associates—plaintiff's primary care physicians*

On January 22, 2018, plaintiff saw Nandita Padigar, M.D., with her primary care physicians' group, for back pain. R. 761. Plaintiff had no difficulty walking, and her strength and range of motion were within normal limits. R. 761–62. She was referred to physical therapy. R. 763.

On February 5, 2018, plaintiff reported to Susan Kim-Foley, M.D., that physical therapy was helping "a little," and she intended to continue. R. 764. She had no difficulty walking and had a normal gait. R. 764–65. Dr. Kim-Foley encouraged plaintiff to eat a healthy diet and exercise daily. R. 765.[6]

---

degenerative changes, and that "[t]he vertebral height and alignment as well as the disc spaces of the lumbar spine are within normal limits." R. 364.

[6] At the time of this exam, plaintiff was 5'1" and weighed 184 pounds, with a body mass index of 34.8. R. 764.

On July 16, 2018, plaintiff reported to Dr. Kim-Foley that she had experienced lateral left knee pain for about a month with clicking. R. 770. Plaintiff had no difficulty walking and had a normal gait, but a positive McMurray's test (a test used to determine the presence of a meniscal tear). R. 770–71. Dr. Kim-Foley referred plaintiff to an orthopedist. R. 771.

### 2.      After August 1, 2018—Plaintiff's Alleged Onset Date

#### a.      *Jordan Young Institute, Orthopedics—arthroscopic surgery on left knee*

James Dowd, Jr., M.D., an orthopedist, examined plaintiff's left knee on August 2, 2018. R. 724, 727, 771. Plaintiff reported moderate left knee pain (rated at six out of ten) with some catching pain, worse with weight-bearing activities, improved with rest, and causing difficulty sleeping. R. 724, 727. Plaintiff further reported that she ambulated without an assistive device, though with a mild limp, could "climb stairs normally with rail and with difficulty," and her walking tolerance was "limited to unlimited." R. 724. Examination revealed plaintiff's range of motion in both knees was 0 to 120. R. 727. She performed active straight leg raises in both legs without difficulty, with no tenderness or pain in her hips, ambulated with a normal gait, and exhibited full strength in both of her quadriceps and hamstrings. *Id.* She exhibited lateral joint line tenderness in the left knee with no effusion. *Id.* X-rays of the left and right knees revealed well-preserved joint space and not "a lot of arthritis to speak of." *Id.* Dr. Dowd referred plaintiff for an MRI. *Id.*

The MRI of plaintiff's left knee performed on August 13, 2018, revealed a complex tear of the lateral meniscus with a two-millimeter lateral meniscal extrusion. R. 743.

On October 5, 2018, a left knee arthroscopy was planned, which did not ultimately take place. R. 729, 733, 758.

On December 6, 2018, plaintiff received an injection in her left knee. R. 735. Tamaryn Parks, PA-C, discussed the importance of continued self-directed physical therapy, and use of over-the-counter medicine for pain. *Id.* Plaintiff ambulated with an appropriate gait and no assistive device. *Id.* Her left knee range of motion was 0 to 120 degrees, and she displayed five out of five quadricep strength. *Id.* She exhibited lateral joint line tenderness and mild effusion. *Id.*

On January 21, 2019, plaintiff reported one to two days of relief from the injection, and that she continued to have swelling and pain at night. R. 737. Plaintiff ambulated with an antalgic gait, and exhibited tenderness and a small effusion. *Id.* Her left knee range of motion was 0 to 120 degrees, and she exhibited full strength in her quadriceps and hamstrings. *Id.* Dr. Dowd assessed left knee arthritis and lateral meniscus tear, and discussed the risks and benefits of proceeding with an arthroscopic procedure on her left knee. R. 737–38.

On February 8, 2019, plaintiff reported an aching, burning pain in her left knee that she rated at seven out of ten, with swelling and popping. R. 740. Her symptoms were aggravated by walking, knee movement, and everyday activities. *Id.* Her symptoms improved with over-the-counter medications, injections, a cane, and rest. *Id.* Justin Griffin, M.D., explained that plaintiff had patellofemoral chondromalacia, as well as a left lateral meniscus tear, explained the risks and benefits of multiple treatment options, and noted that, "from an x-ray standpoint," plaintiff was "not ready for any kind of knee replacement." R. 739–40. Plaintiff expressed a desire to go forward with arthroscopic knee surgery. R. 740.

On February 27, 2019, plaintiff received pre-operative counseling prior to a scheduled left knee arthroscopy. R. 749. Her range of motion was 0 to 120 with no instability and mild effusion, and good tone in the quadriceps. R. 748.

On March 12, 2019, Dr. Griffin performed a left knee arthroscopy. R. 750. Following the procedure, plaintiff was cleared for both weight-bearing and range of motion, as tolerated. R. 751.

Plaintiff returned for a follow-up appointment on March 25, 2019, reporting that she fell one week after surgery while walking down stairs. R. 753. X-rays revealed no evidence of fracture. *Id.* Her knee range of motion was full extension to 110 degrees flexion with no drainage or redness and minimal effusion. *Id.* Plaintiff reported no lateral knee pain, but an increase in medial joint pain. *Id.* She was instructed to start physical therapy and to take pain medication as needed. *Id.*

On May 16, 2019, plaintiff reported pain with ambulation and movement of the left knee; back pain, nausea, chills, and tenderness; and walking with a limp. R. 756. Her left knee range of motion was limited due to pain and tenderness, and her quadricep strength was four out of five. R. 757. She ambulated with an appropriate gait and no assistive device. *Id.* Her knee had neutral alignment, with medial and lateral joint line tenderness and no effusion. *Id.* Tamaryn Parks, PA-C, performed an aspiration of plaintiff's left knee, and noted "[i]nitial fluid yellow with dry aspiration no specimen for culture sensitivity." R. 755–57.

### b.    *Chesapeake Regional Healthcare—emergency department*

On November 25, 2018, plaintiff was treated at the emergency department after experiencing constant left back and flank pain for one week. R. 651–52. Plaintiff had no significant flank tenderness on examination, and could touch her toes without exacerbating the pain. R. 651. A computerized tomography ("CT") scan of her abdomen and pelvis revealed no acute abnormalities. R. 656. Plaintiff was discharged home with muscle relaxers and anti-inflammatories and directed to do no heavy lifting, pushing, or pulling for one week. R. 657.

On March 18, 2019, six days after arthroscopic surgery on her left knee, plaintiff presented at the emergency department with left knee pain following a fall that caused her knee to be fully flexed. R. 676–77, 679. She exhibited minimal swelling and tenderness, and had a full range of motion of her left ankle without pain. R. 679. X-rays showed joint effusion, but no fracture or dislocation. R. 679–80, 682–83. A knee immobilizer was applied, and plaintiff was advised to rest, use ice, elevate her knee, and take Tylenol or ibuprofen for pain. R. 680.

Plaintiff presented to the emergency room three days later on March 21, 2019, with left knee, low back, and left hip pain. R. 686–87. Hip x-rays showed mild degenerative joint disease in both hips, but an otherwise normal study. R. 689, 693. Plaintiff exhibited an active range of motion of both hips and the right knee, and there was no effusion, redness, or drainage over the two arthroscopic wounds on the left knee. R. 689. Plaintiff had a reduced range of motion in the left knee, but could bend to approximately 80 degrees. *Id.* Plaintiff was instructed to continue to use the knee immobilizer and crutches, elevate her leg, ice the knee, and take prescribed Tylenol and ibuprofen. R. 690.

Plaintiff returned to the emergency department on May 3, 2019, with right flank pain for the previous four days and some left knee pain. R. 697, 700. Her low back was tender to palpation. R. 700. Her left knee had no swelling, redness, or crepitus, and a full range of motion. *Id.* Her gait was normal. *Id.* Plaintiff was given a prescription for a muscle relaxer. R. 702.

On May 8, 2019, plaintiff was seen at the emergency room for left knee pain that increased with movement and weight bearing. R. 710–11. She reported not taking any medication for the pain. R. 711. On examination, plaintiff had tenderness in the medial and lateral joint line, but had a normal range of motion, no swelling, no effusion, no erythema, and normal patellar mobility. R.

713. An x-ray showed no acute findings. R. 713–14, 717–18. Plaintiff was given an ace wrap and crutches and instructed to follow up with her orthopedist. R. 714.

### c.   *Volvo Medical Associates—plaintiff's primary care physicians*

On September 10, 2018, plaintiff reported to Dr. Kim-Foley that she had continuing pain in her left knee with conservative therapy. R. 773. Plaintiff reported that she had been a foster parent, and needed physical forms completed for foster care. R. 773. She indicated that the two children that she had taken care of for one and a half years "just left," and that she currently was taking care of two other foster children, as well as her nephew. *Id.* Dr. Kim-Foley noted that plaintiff had no difficulty walking, had a normal gait, and her strength was within normal limits. R. 773–74.

On February 22, 2019, Dr. Kim-Foley cleared plaintiff for her arthroscopic surgery. R. 758, 760. Dr. Kim-Foley noted plaintiff had no difficulty walking and had a normal gait. R. 758–59.

On May 14, 2019, Lindsay Houghton, FNP-BC, treated plaintiff for lower back pain. R. 779. Plaintiff had a full range of motion, no joint swelling, no tenderness, and a normal gait. R. 781. X-rays revealed L5-S1 loss of disc space, and, otherwise, minimal degenerative changes. R. 790. Plaintiff was prescribed Prednisone, and given a referral to physical therapy. R. 779.

On June 11, 2019, plaintiff was seen by Dr. Kim-Foley for a burning sensation in her left foot, even when at rest. R. 782. She also reported non-radiating, low back pain, without numbness or tingling, for a month. *Id.* Her lower back was tender, but she had a full range of motion and a normal gait. R. 783. The plantar aspect of her heel and arch was tender. *Id.* Plaintiff was referred to physical therapy for her back, advised to avoid going barefoot, and referred to a podiatrist. *Id.*[7]

---

[7] Examination notes from plaintiff's treating physician, Dr. Kim-Foley, from September 2018,

#### d.     *Atlantic Foot and Ankle Center—Dawn M. Pfeiffer, Podiatrist*

On June 25, 2019, Dawn M. Pfeiffer, DPM, with the Atlantic Foot and Ankle Center treated plaintiff for left heel pain. R. 802–04. Examination revealed full strength in plaintiff's lower extremities, with no areas of weakness or guarding, negative Tinel's and normal reflexes. R. 803. Plaintiff exhibited pain and tenderness to palpation to the plantar and with dorsiflexion of digits, flattening of the arch, calcaneal eversion, and "too-many-toes sign." R. 804. Dr. Pfeiffer diagnosed plantar fasciitis. R. 802–04. She instructed plaintiff on stretching exercises, appropriate shoes, the need for orthotics, and the risks and benefits of cortisone injection. R. 804.

On September 4, 2019, Dr. Pfeiffer filled out a one-page, check-the-box form, medical source statement. R. 820. Aside from writing out that plaintiff's medical condition was "plantar fasciitis," Dr. Pfeiffer's opinions are recorded by means of check marks. *Id.* Dr. Pfeiffer indicated that plaintiff had the following limitations: she could occasionally lift and carry less than 10 pounds but never 10 pounds or more; she could stand or walk for 2 hours in an 8-hour workday, and sit for 6 hours. *Id.* Dr. Pfeiffer noted that plaintiff did not ambulate with a cane or other assistive device, and would not need to elevate her legs during the day, but that she did have an antalgic or disturbed gait. *Id.* Lastly, Dr. Pfeiffer found plaintiff would miss one day or less of work per month as a result of pain. *Id.*

#### e.     *Opinions of State Agency Physician*

On May 7, 2018, Richard Surrusco, M.D., reviewed plaintiff's medical record and found plaintiff capable of performing light work and noted the following exertional limitations: she could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; she could

---

February 2019, and June 2019, indicate plaintiff was 5'1" tall and weighed between 172 and 179 pounds, with a body mass index of 32.5 to 33.8. R. 759, 774, 779, 782.

stand and walk for 6 hours in an 8-hour workday and she could sit for 6 hours in an 8-hour workday; she was not limited in her ability to push or pull hand or foot controls, other than the limitations noted for lifting and carrying; and, she could only occasionally stoop, kneel, crouch, crawl, or climb ramps, stairs, ladders, ropes, or scaffolds. R. 65–66.

Dr. Surrusco reviewed plaintiff's medical record on July 6, 2018, during the reconsideration process. R. 78–79. He found the same exertional limitations with the exception of finding plaintiff capable of frequently climbing ramps and stairs. *Id.*

### III. THE ALJ's DECISION

To evaluate plaintiff's claim of disability,[8] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations for determining whether an individual is disabled. *See* 20 C.F.R. § 404.1520(a). Specifically, the ALJ considered whether plaintiff: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work in light of her residual functional capacity; and (5) had an impairment that prevents her from engaging in any substantial gainful employment. R. 17–23.

---

[8] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *accord* 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a).

The ALJ found that plaintiff met the insured requirements[9] of the Social Security Act through December 31, 2022, and she had not engaged in substantial gainful activity since August 1, 2018, her alleged onset date of disability. R. 17.

At steps two and three, the ALJ found that plaintiff had the following severe impairments: (a) status-post right knee arthroscopy; (b) status-post left knee arthroscopy with partial lateral meniscectomy; and (c) obesity. *Id.* The ALJ classified any additional impairments as non-severe, specifically: headaches, gastroesophageal reflux disease, degenerative changes of the lumbar spine, degenerative joint disease of the bilateral hips, left wrist triangular fibrocartilage complex injury, and plantar fasciitis. R. 17–18.

With respect to plaintiff's back, the ALJ noted that imaging studies showed minimal degenerative changes in the lumbar spine, with the only significant finding being a loss of disk space at the L5-S1 level. R. 18. Plaintiff's back tenderness and muscle spasm were not accompanied by any radicular signs. *Id.* She noted plaintiff's treatment for her back pain consisted of "very briefly" attending physical therapy and receiving muscle relaxers intermittently. *Id.* The ALJ concluded "the diagnostic evidence, clinical signs, and treatment concerning [plaintiff's] back are all quite modest," and the impairment "does not cause more than minimal limitations." *Id.*; *see also* R. 22.

With respect to plaintiff's hips, the ALJ described how imaging of plaintiff's hips showed "mild degenerative joint disease bilaterally." R. 18. She noted that a physical therapist in January 2018 found that plaintiff's hip strength was quite reduced, but that other exams of her hips had been unremarkable. *Id.* The ALJ concluded that plaintiff had not received any treatment

---

[9] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

specifically for her hips, and the "the diagnostic evidence, clinical signs, and treatment are consistent with no more than minimal limitations." *Id.*

With respect to plaintiff's left foot, the ALJ acknowledged that a podiatrist "recently" assessed plaintiff with plantar fasciitis, but noted that the impairment did not meet the durational requirement.[10] *Id.*

The ALJ further determined that plaintiff's severe impairments, either singly or in combination (along with her other conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 18–19.

The ALJ next found that plaintiff possessed the RFC to perform light work, *see* 20 C.F.R. § 404.1567(b), subject to the limitations, including, that she can only occasionally "climb ladders, ropes, and scaffolds, stoop, kneel, crouch, and crawl." R. 19–22.

In reaching this assessment, the ALJ summarized plaintiff's hearing testimony, including her testimony that she walks with a cane, uses a knee brace, can walk for only five minutes at a time, has arthritis and a pinched nerve in her back, cannot sit or stand for long periods of time, and her knees buckle when she stands. R. 19. The ALJ discussed plaintiff's testimony regarding knee surgeries, physical therapy, and cortisone shots to treat her knees, and her providers' preference that she take nothing stronger than Tylenol for pain. *Id.*

The ALJ walked through plaintiff's medical record, starting in 2015, several years prior to plaintiff's August 2018 alleged onset date. R. 20–22. The ALJ found plaintiff: (1) "was almost

---

[10] "Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that *has lasted or can be expected to last for a continuous period of not less than 12 months*." R. 15 (emphasis added); *see also* 20 C.F.R. § 404.1505(a).

entirely healed from surgery [on her right knee] as of her alleged onset date, and exhibited no abnormalities after January 2018"; (2) encountered slowly progressive symptoms in her left knee, which did not affect her gait until January 2019; (3) recovered from her March 2019 left knee surgery in two months, although she had some reduced motion in May 2019; (4) did not use a cane to ambulate after her alleged onset date according to the medical record; and (5) had a body mass index in the low 30s, contributing to knee pain with weight-bearing activities, but her clinical signs were largely normal until 2019 and had not been consistently abnormal in 2019. R. 21–22.

The ALJ addressed the medical source opinion from Dr. Pfeiffer that plaintiff could occasionally lift and carry up to 10 pounds, stand or walk for 2 hours in an 8-hour workday, and sit for 6 hours. R. 21. The ALJ found that this opinion was not persuasive, having been reached following one examination and based on clinical signs of an impairment that was non-severe due to its short duration. *Id.*

The ALJ found the state agency medical consultant's opinion given on reconsideration more persuasive, and adopted the opinion—that plaintiff could perform light work, but only occasionally stoop, kneel, crouch, crawl, and climb ladders, ropes, and scaffolds, and frequently climb ramps and stairs—into her RFC. *Id.* The ALJ further noted that plaintiff's activities of daily living were consistent with light work. R. 22.

Based upon the RFC assessment, the ALJ determined at step four that plaintiff could not return to her past relevant work. *Id.*

Finally, at step five, and after considering her age, high school education, work experience, and RFC, the ALJ found that plaintiff could perform other jobs, such as information clerk, clerical checker, and office helper, which existed in significant numbers in the national economy. R. 22–

23. Accordingly, the ALJ concluded plaintiff was not disabled from August 1, 2018, through the date of the ALJ's decision and was ineligible for a period of disability or DIB. R. 23–24.

## IV.    STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589 (citing *Hays*, 907 F.2d at 1456). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing

the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman,* 829 F.2d at 517.

## V.    ANALYSIS

The ALJ committed no legal error and substantial evidence supports her formulation of plaintiff's RFC and assessment of plaintiff's ability to stand and walk. RFC represents a claimant's ability to "meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4). It represents the most a claimant can do in spite of any limitations. *Hines v. Barnhart,* 453 F.3d 559, 562 (4th Cir. 2006); *see* 20 C.F.R. § 404.1545(a)(1). To facilitate an RFC assessment, a claimant supplies pertinent evidence and the Commissioner assembles a "complete medical history." 20 C.F.R. § 404.1545(a)(3). The ALJ may consider statements about a claimant's abilities provided by medical sources, as well as non-medical evidence, including a claimant's views about limitations resulting from her symptoms. *See id.* After considering all the evidence, the ALJ's duty is to make an RFC assessment. *Id.*

Plaintiff argues the ALJ erred in finding she was capable of standing or walking for six hours in an eight-hour workday. Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 14, at 4–11. Plaintiff summarized her medical history from one year prior to her alleged onset of disability date through the date of the hearing, including two arthroscopic knee surgeries, two left knee steroid injections, and the onset of plantar fasciitis. *Id.* at 7–10. Plaintiff argues that it is "not reasonable in this case to conclude that a 53-year-old woman with this objective medical evidence, particularly both of her MCLs being torn, remains capable of standing/walking six hours in an eight-hour workday." *Id.* at 11. Plaintiff further argues that, had the ALJ assessed her as capable of less than six hours of standing or walking, the finding would have triggered a "between the

20

ranges" analysis to determine whether she was capable of performing light work or was limited to sedentary work. *Id.* at 7. Plaintiff asserts that remand is necessary to allow the ALJ to reformulate the RFC with respect to standing and walking to "something less than six hours total because to find it to be six hours is not supported by substantial evidence." *Id.* at 11.

The Commissioner contends that substantial evidence supports the ALJ's finding that plaintiff could meet the standing and walking requirements of light work. Mem. in Supp. of Def.'s Mot. for Summ. J. and in Opp. to Pl.'s Mot. for Summ. J. ("Def.'s Mem."), ECF No. 16, at 14. The Commissioner references minimal findings and conservative treatment of plaintiff's back and hip impairments, minimal treatment records for plaintiff's foot impairment, and only infrequent findings of gait abnormalities or use of an assistive device due to plaintiff's knee impairments. *Id.* at 14–16. Based on this medical evidence and the opinions of the state agency physician, the Commissioner asserts the ALJ determined plaintiff's RFC fell "squarely within the light definition," and not in the grey area between light and sedentary. *Id.* at 17. Accordingly, the Commissioner asserts plaintiff failed to satisfy her burden of establishing that the ALJ's RFC determination was not supported by substantial evidence. *Id.* at 17–18.

The Court finds that substantial evidence supports the ALJ's RFC assessment that plaintiff is capable of performing light work, except that she can only occasionally stoop, kneel, crouch, crawl, and climb ladders, ropes, and scaffolds. R. 19. The ALJ accurately acknowledged that plaintiff was almost entirely healed from her right knee surgery by August 2018. *See* R. 322–23 (normal examination and ambulating without an assistive device in November 2017, three months after surgery); R. 523 (normal range of motion and strength in lower extremities in December 2017); R. 761–62 (normal range of motion and strength and no difficulty walking in January 2018); R. 764–65 (noting strength and range of motion within normal limits, normal gait, and no difficulty

walking in February 2018); R. 590, 770–71 (no difficulty walking, normal gait, and ability to move all extremities without difficulty in July 2018).

Further, the medical records support the ALJ's finding that slowly progressing symptoms in plaintiff's left knee did not affect her gait until January 2019, and that she recovered from her March 2019 left knee surgery within two months, exhibiting some reduced motion in that knee in May 2019. *See* R. 735, 773–74 (noting a normal gait and no difficulty walking in September and December 2018); R. 737 (noting an antalgic gait in January 2019); R. 700, 781 (noting normal gait in May 2019, but limited left knee range of motion due to pain and tenderness). The medical record reflects mostly normal findings and normal gait, with only a few findings of an antalgic gait. *See* R. 514, 700, 727, 735, 757, 758–59, 764–65, 770–71, 773, 781, 783 (noting normal gait); R. 353, 361, 737 (noting antalgic gait).

Further, there are only a few references to use of an assistive device after August 1, 2018. On February 8, 2019, plaintiff reported to Dr. Griffin that her symptoms improved when she used a cane. R. 740. Plaintiff had arthroscopic surgery the following month. R. 750. Plaintiff was also given crutches in the emergency department on May 8, 2019, due to knee pain following a fall and was instructed to follow up with her orthopedist. R. 714. She was not using an assistive device to walk during her follow-up appointment with the orthopedist on May 16, 2019, where she had an appropriate gait. R. 757. The record supports the ALJ's finding that plaintiff did not have a continuous 12-month period of compensated gait or significantly reduced range of motion as a result of her knee impairments. R. 22.

The record also supports the ALJ's finding that plaintiff's back impairment "does not cause more than minimal limitations," with minimal degenerative changes, no radicular signs, and

conservative treatment. R. 18. Plaintiff testified that she experienced back pain due to arthritis and a pinched nerve for which she does home exercises and attends physical therapy. R. 42–43.

Plaintiff attended physical therapy for back pain in January and February 2018, prior to her alleged onset date, but failed to schedule any further appointments. R. 351–53. Plaintiff's treating physicians' group referred her to physical therapy for back pain in January 2018, May 2019, and June 2019, and noted at each visit that plaintiff exhibited a full range of motion and a normal gait. R. 761–763, 779–83[11]. There is no indication in the record that plaintiff attended physical therapy as a result of the May or June referrals. In addition, plaintiff was treated at the emergency department with muscle relaxers for back pain in July 2018, November 2018, and May 2019. R. 592–93, 651, 657, 700–702. X-rays taken on May 14, 2019, revealed L5-S1 loss of disc space, and, otherwise, minimal degenerative changes, and the only diagnoses made were for lumbar strain R. 514, 524, 790. Accordingly, the record supports the ALJ's finding of minimal limitations due to plaintiff's back impairment. R. 18.

The ALJ's finding that plaintiff's hip impairment caused no more than minimal limitations is also supported by the record. *Id.* The ALJ discussed imaging that revealed mild degenerative joint disease bilaterally, and a physical therapist's finding of reduced hip strength in January 2018. *Id.*; *see* R. 639, 693. The ALJ noted that other examinations of plaintiff's hips were unremarkable and that plaintiff has not received any treatment specifically for her hips. R. 18; *see* R. 727 (noting active bilateral straight leg raises without difficulty and no pain or tenderness in hips).

The only complaint of hip pain following plaintiff's alleged onset date occurred on March 21, 2019, when hip x-rays showed mild degenerative joint disease in both hips, but an otherwise normal study. R. 689, 693. On examination, plaintiff exhibited an active range of motion of both

---

[11] Plaintiff was also given a prescription for Prednisone at the May 2019 appointment. R. 779.

hips. *Id.*; *see* R. 727 (finding no tenderness or pain in plaintiff's hips during an examination on August 2, 2018). Further, plaintiff did not testify regarding hip pain during her hearing.

Finally, the ALJ's finding that plaintiff's left foot pain and assessment of plantar fasciitis did not meet the twelve-month durational requirement is supported by the record. R. 18. The first complaint of left foot pain in the record occurred on June 11, 2019, when plaintiff was treated by her primary care physician. R. 782. At the time of that visit, plaintiff's gait was normal. R. 782–83. On a referral from her primary care physician, plaintiff treated with Dr. Pfeiffer two weeks later on June 25, 2019. R. 802–04. Dr. Pfeiffer diagnosed plantar fasciitis and discussed stretching exercises, appropriate shoes, orthotics, and the risks and benefits of cortisone injection. R. 804. There are no further treatment records pertaining to plaintiff's foot. At her hearing on September 20, 2019, three months after her first complaint of foot pain, plaintiff testified that she wore orthotics and had received a cortisone injection for her foot pain. R. 41–42, 48. The ALJ correctly determined that this medical record did not support a finding that plaintiff's foot pain "has lasted or can be expected to last for a continuous period of not less than 12 months." R. 15, 18; *see also* 20 C.F.R. § 404.1505(a).

After summarizing plaintiff's medical record, the ALJ addressed the medical source opinion from Dr. Pfeiffer, the only treating physician to opine on plaintiff's limitations. R. 21, 820.[12] The ALJ found that the opinion—that plaintiff could occasionally lift and carry up to 10 pounds, stand or walk for 2 hours in an 8-hour workday, and sit for 6 hours—was not persuasive,

---

[12] Effective March 27, 2017, the Social Security Administration rescinded SSR 96-2p including the "treating physician rule." 82 Fed. Reg. 5844-01, at 5844-45, 5854-55 (Jan. 18, 2017). The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c.

having been reached following one examination and based on clinical signs of an impairment that was non-severe due to its short duration. R. 21. The ALJ noted that the only explanation offered for the assessed limitations was a check mark indicating plaintiff had an antalgic gait, a finding that was not consistent with the vast majority of the treatment notes in the record. *Id.* The ALJ properly found Dr. Pfeiffer's opinions were unsupported. R. 21, 820; *see Cummins v. Colvin*, No. 2:14cv165, 2015 WL 1526188, at *3 (E.D. Va. Apr. 2, 2015) (noting a "distaste . . . for medical reports that do not contain at least a minimal amount of written explanation"). "Such check-the-box forms, unaccompanied by explanations are weak evidence at best, and not entitled to great weight even when completed by a treating physician." *Cummins*, 2015 WL 1526188, at *12 (citing *McConnell v. Colvin*, No. 2:12cv5, 2013 WL 1197091, at *6 (W.D. Va. Mar. 25, 2013)); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993).

The ALJ found the state agency medical consultant's opinion that plaintiff was capable of light exertional activities more persuasive. R. 21. The ALJ adopted the opinion given on reconsideration—that plaintiff could perform light work, but only occasionally stoop, kneel, crouch, crawl, and climb ladders, ropes, and scaffolds, and frequently climb ramps and stairs—into her RFC. *Id.* The ALJ noted plaintiff's indication that she could climb stairs normally with a rail, "albeit with some difficulty." *Id.* The ALJ further noted that plaintiff's activities of daily living were consistent with light work, referencing plaintiff's claims of performing light household cleaning, grocery shopping, and providing foster care for her nephew. R. 22; *see* R. 44–47, 223–26, 773 (indicating plaintiff was providing foster care to two children in addition to her foster nephew).

The ALJ explained and reasonably concluded that the medical record, including the opinions of a state agency physician who found plaintiff able to perform light work, failed to

support the loss of functioning alleged by plaintiff. R. 21–22. Substantial evidence supports the ALJ's RFC assessment, and plaintiff's motion to remand to allow the ALJ to reformulate the RFC with respect to standing and walking to "something less than six hours total" should be **DENIED**.

Plaintiff next argues that, due to her ability to stand and walk less than 6 hours in a workday, she falls between the two exertional levels of light and sedentary requiring additional analysis. Pl.'s Mem. at 5 (citing 20 C.F.R. § 404.1567(a)). Having found that substantial evidence supports the ALJ's RFC assessment that plaintiff can perform light work without a limitation regarding her ability to stand and walk, plaintiff's motion to remand to require the ALJ to "reformulate the RFC with standing/walking being something less than six hours total" triggering a "between the ranges" analysis, Pl.'s Mem. at 7, 11, should be **DENIED**.

## VI.  RECOMMENDATION

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment, ECF No. 13, be **DENIED**, and the Commissioner's motion for summary judgment, ECF No. 15, be **GRANTED**.

## VII.  REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.  Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with

26

a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

     2.     A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

     The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

_____/s/_____

Robert J. Krask
United States Magistrate Judge

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
April 14, 2021